We will turn instead to 21-1038 Wright v. Portercare Adventist. Honors. My name is Richard Barkley. I'm with the law firm of Anderson Barkley LLC. And I'm representing the appellant Stacey Wright in this appeal. During the argument, I will refer to the appellee Portercare Adventist Health Systems by its DBA name, Cinchara. The two principal issues here are one, did Stacey Wright raise a genuine issue of material fact about whether she was treated differently than similarly situated males? And two, if she did, did she present sufficient evidence to allow a jury to find that the reasons advanced by Cinchara for the disparate treatment were pretextual? Wright contends that she was treated differently from her male counterparts in several circumstances. The first is when she was disciplined for running an errand after clocking out during work hours, while her male counterparts were not disciplined for the same activity. Mr. Barkley, it's not at all clear to me what the reason was for the discipline here. Was it in fact that Ms. Wright was disciplined for running an errand or was it an insubordination, not going to work in the lab that needed assistance? Sure. And my response to that would be that it's not entirely clear means for a jury to decide. It would be up to the jury to say, did she, was she in fact insubordinate or was she punished just for running the errand? And if you like, I'm sorry. Well, for her to make out a discrimination claim with respect to the errand incident, she would have to show that there's comparators and they were treated differently. And I think the argument on the other side is that the male members of the cath lab are not comparators because none of them went off to run an errand after being given a direct order to be somewhere else. Can you address that, please? Yes, Your Honor. It's essentially the same thing, I think, as the insubordination argument. Well, they're certainly related. Yes. Right. Okay. And the basically said, sure, contends that Ms. Wright was insubordinate because Lombard had sent a message that said, quote, the PACU needs help today with admission vitals and IVs. Would you all go over to help? So if it were insubordinate that she ran an errand instead of going to PACU to help. And by the way, later on we'll address that she did in fact contact PACU. But how is Ms. Wright's deserving of punishment but the male staff members who also did not comply with the instruction to go over to PACU was not deserving of discipline? All of the cath lab. Let me break it out for you because what as I understand the position on the other side is that first of all, they don't agree that the message was sent to all of them. But even assuming that it was, it's one thing to continue working in the cath lab and not immediately go over to the hospital. It's another thing to get a message telling you to go over to the hot report over to the hospital and instead grab your purse and run to Walmart. That that's the argument as I understand it. Okay. Well, I think for purposes of the issue, it would be up to a jury to decide whether or not Frank Prismis, for example, who just didn't go, just did not comply with the request, whether that is not insubordination and whether Ms. Wright's notifying them that she was running a 30-minute errand after she had gone to back, had spoken with staff at PACU and determined that they didn't have any immediate need. That somehow was insubordination. Okay. So let's let's say we spot you a prima facie case. Okay, and I want to focus you on pretext. You have a situation where two direct supervisors of Ms. Wright have both gone to management and complained that she's insubordinate and at that point they terminate her. What evidence do you have that the decision to terminate her was pretextual and was pretext for discrimination based on gender? Let's take the second instance, which is the instance involving Archuleta. Archuleta went and you have to sort of look at the context of Archuleta's involvement. Archuleta went to, became the manager of the Calc Lab on January 8th, I believe. He has a meeting with Ms. Wright five days later. Three days after that and coming out of that meeting, he testified that he had a very positive attitude or positive view of Ms. Wright. Three days later, three days, he goes to HR and complains. Now, what does he complain to HR about? The most significant thing that he complains about is the fact that the medicine being used properly. But in fact, the way that circumstance arose is he saw one of the Calc Lab males, John West, charging medicine and that it was wrong. He then went and asked Frank Cousmas, who also said that was the way they had been taught. He asked Stacey Wright and she said that was the way they had been taught. And then he determined all three of these people are liars. Now, to me, that's pretty astonishing on its own right. But nonetheless, he says all three of these people are liars and he goes to HR and he complains about the woman. He makes no complaint. But he didn't limit his complaint to the medication issue. His complaints about Ms. Wright were more comprehensive. And again, in subordination that she had an influence on the other employees and was giving them a negative attitude. I have the list in front of me somewhere. But and that she was having doctors and calling him up and putting pressure on him to keep her there and keep her happy. So his series of yes, you're right. There was one complaint involving that medic how they dispense medication, but it his complaint isn't just limited to that his issues with Miss Wright are more comprehensive. Does that matter? It could matter but let's look at a few of them. For example, let's talk about that. His concern was that Miss Wright had a negative attitude and would be resistant to the changes. He wanted to implement. Well, he was also concerned about a HIPAA violation where she texted or emailed. I'm not sure on an unprotected device and server the personal medical information about a patient. The record is clear that the HIPAA violation issue was never raised as part of the termination process. So that issue was not part of any termination issue and it's a complicated issue. But the fundamental point is that's not something that was considered for purposes of termination. He did not raise that when he went to Jodi Parish and complained about his complaints were number one. He thought she was lying even though he didn't do an investigation to see whether or not she might be lying and number two that she had a bad attitude and he was afraid that she may quite resist changes. He wanted to make but let's look at the record on that. The changes that he wanted to make there are two of them. They talked about and she did not resist either one of them. She agreed to go along with them. And as far as the bad attitude, look at the deposition testimony of Archuleta that's in the record because he goes through an extensive discussion of how the two males had very bad attitudes and so he's concerned that Ms. Wright has a bad attitude so he wants to fire her but he's not concerned that Frank Christmas or John West had bad attitudes and he wanted to fire her. These are all again instances in which the female was treated disparately. Now with respect to the fact that she had a lot of influence or sway or people listen to her. That's a very odd argument. It is essentially there's a person who has a lot of influence here and it's a woman and so she's sort of gotten above her station people listen to her and pay attention to her instead of listening to me and paying attention to me. Isn't that essentially saying this person is it is somebody who's too discrimination based on sex. Did I answer your questions yet? Why don't you take why don't you turn to your retaliation claim? I'm out of time. Sure. I mean, let me focus you a little bit on Ms. at all until the third complaint that she made. Does that mean that for purposes of retaliation? We can't look at those prior. I don't believe that's that's correct. When do you think she first mentioned that she thought it was gender-related if you look at her complaint when she when she went on her errand to But she can't and I believe that's November 11. She then comes back and meets with the director and managers of her department. In her statement to them, she says. Well, that's how it's the practices in our office. And why are you treating me differently than my than the males? So, I think she raised the gender issue right out of the box. And and that concern in fact was highlighted by HR when the the written warning the initial written warning was issued sent by Ms. Lombard to HR Alicia. Lisa, I believe her name is came back and said we really need to look into the fact whether she says she's being treated differently than a man. So that issue was there from the very beginning. Let me let me free run out of time. One other question I had for you is that you rely on one that the denial of the transfer as evidence of discriminatory treatment. We have case law that it says that a transfer from one comparable position to another comparable position is not an adverse employment action that could trigger liability. Isn't isn't that what we're dealing with here in terms of that transfer? Well, I don't believe so, your honor. And why not? I'll try to explain the transfer was essentially a situation to get out of a poisoned attitude atmosphere. Ms. Wright was by that time fully aware that her job was in jeopardy and she and that she was being discriminated against at least in her view. By her superiors, it was an opportunity to go back and essentially ameliorate that problem. And and because of that, she was going from a job that she was where she was likely to lose her job to a new job where she could start over and and do well. And so I think in that sense, that was not that that was a movement from a very bad situation. The denial of it. You're out of time. So if you want to sum up, that's fine. Okay, your honors. If we look at the entire parameter of the events after Julie Lombard became the cath lab manager until the termination of Ms. Wright, all of the there are numerous instances in which she was treated desperately and because of that, ultimately suffered the adverse action of termination. Mr. Sadie, when you were ready. May it please the court. My name is Brian Sabie. I represent Centura. This case can be disposed of based on three simple facts. First, it is undisputed who the decision-makers were both with respect to the denial of transfer. If that were to be considered an adverse employment action and with respect to the termination, you didn't raise the question of adverse employment action. Did you? You didn't challenge whether a horizontal transfer was a adverse employment action. That's correct. Okay, so that's waived, right? I believe you may be able to affirm based on any valid basis, but that's not been part of the argumentation up to this point. But with respect to both that and the termination, the decision-makers, it's undisputed. And in fact, it's positively asserted by Wright herself in the briefing that the decision-makers were the CEO, Todd Fulkenberg, the vice president of HR, Sondra Davis, and the HR director, Jody Parrish. Second, Wright admitted during her deposition that she has no basis to believe that any one of those three were motivated by gender bias. Third, while Wright certainly claimed she was being targeted and treated differently from her co-workers prior to her termination, she never asserted that the reason for this was her gender. Instead, when asked point-blank by Sondra Davis what went wrong, and this was in the only meeting in which there's any record of her even mentioning gender, her answer was that it was a personality conflict with Julie Lombard. Mr. Sabe, can I please ask you just a threshold question about the legal standard here? Don't we have to send this case back because the district court got the legal standard wrong and held Ms. Wright to a more likely-than-not standard at the summary judgment stage, which was a mistake of law? Your Honor, I don't believe that that's how the order should be interpreted. Certainly, the cases that he cites for that, and I believe also his opinion, references the preponderance of the evidence standard in relation to the ultimate fact-finder, not the standard at summary judgment, which Judge Martinez correctly articulated the summary judgment standard in his opinion. Furthermore, it is clear from the findings that he did make, which were amply supported by evidence, that under the correct standard, summary judgment was proper. I mean, we're on de novo review, right? Yeah. Even if the district court made an error, we don't have to compound the error by applying the wrong standard here, do we? No, that's correct, Your Honor, and I would ask that you apply the correct standard and find that there's no genuine issue of material fact. So Wright admits she has no basis to believe that any of the decision-makers were motivated by gender bias, and when asked what the source of the problem was, she asserted something other than gender. Well, that's not entirely true, is it? Because when she was talked to about running her errand, she pointed out that she was the only female member and that they weren't, that they hadn't raised this issue with the others who ran errands all the time. So that was in the January 5th, 2017 meeting with Sondra Davis, and she did, she did for the first time mention her gender in connection with the fact that she was being treated differently from male co-workers, but it was just a short while later in the conversation that Julie, that Sondra Davis asked her, so what, what went wrong? What caused things to go south in your relationship? And her response was it was a personality conflict. So she, it did sound like she was beginning to make an allegation of gender discrimination, but she never, she never actually said that. She just pointed out that she was being treated differently. But don't we take all inferences in favor of her at this stage? I mean, she certainly made a reference to gender. She did make a reference to gender. And she said, I'm being treated differently, and they're male and I'm female. Yes, she did say that, but then she went on to give an explanation other than gender when asked what the source of the problem was. So, although she started, I'm sorry, what? Can't they both be true? You have a, I have a personality conflict with you because you treat me differently than you treat the men. They aren't mutually exclusive. I think that's true, but she never, she never got all the way to stating that it was because of gender. But regardless of the Walmart incident, let me, let me address the final written warning and its relationship to the ultimate termination decision. The final written warning was based on the Walmart incident and several other issues that were unique to Wright. And Wright attempts to create a false parallelism by zoning in exclusively on the commonality. Now, as you pointed out, the even, even with respect to what parallelism exists, it's far from perfect. Mr. Prismus was not under an immediate order to do something else when he left to pick up his wife at the airport. But what I think is perhaps more compelling is that the Walmart incident was one of several things mentioned in the final written warning, all of which relate to one underlying problem. The underlying problem is that Wright was unsupportive of her manager. And she admitted that in her conversation with Sondra Davis, she admitted that she had been less than very friendly and open and willing to assist towards Lombard. So where the underlying problem is admitted, quibbles about the factual details do not raise a genuine dispute of material fact. Furthermore, the final written warning wasn't the basis for the termination decision. The basis for the termination decision, and this is facially disputed, but there's really no basis for disputing it, is that a second manager in a row complained that she was unsupportive. So the details of the final written warning and the Walmart incident in particular were not a significant factor in the ultimate termination decision, rather the underlying problem, her unsupportiveness, which she admitted. What about Mr. Wright's argument today that Archuleta had a problem with three of them? Two of them were males and it was Wright. And notwithstanding that, only one of them got fired and it was the woman. Yeah, let me address that. So with respect to that, there's really, there's no dispute that she never mentioned gender. I mean, she never complained about that on a gender basis. He made that complaint and she got terminated. And he didn't mention gender either. Let's get off the don't mention gender thing. What I want to know is, what about Mr. Wright's argument that he had problems with two men and Ms. Wright. She got fired and they didn't. Yeah. So as with the Walmart incident and the final written warning, Wright zeros in on the commonalities and ignores the differentiating factors. And 10th Circuit precedent is clear that where the difference. Tell me what the differentiating factors are. Yes. Well, let me just, I have here a copy of Jodi Parish's notes from the meeting with Frank Archuleta and I'll just highlight for you some of the factors that are unique to Stacey Wright. And I'll tell you that the lidocaine issue and the improper charging issue takes up about half a page. Will you give me the reference site on that? Yeah, it's at page 437 in the record, Exhibit 33, Deposition Exhibit 33. So here's some quotations that are that are unique to Wright. He, referring to Frank Archuleta, has concerns based on his interactions and observations that Stacey's not going to help this department succeed. Frank shared that everyone, physicians and cath lab staff knows what is going on with her and the HR issues. This surprised him that this information is being shared by Stacey and they're all discussing it. He doesn't think it's appropriate. A little while later on Frank's third day last Wednesday, Stacey commented to Frank, quote, I've talked to a couple of South Denver cardiologists about you, end quote, and then walked away. Now, page 438. Friday, 1-12, Dr. Let me ask, I'm concluding where you're going on this. What you're saying is that Frank Archuleta had a problem with Ms. Wright and others, but he had more problems with Ms. Wright than he had with the men. And therefore she gets fired. Isn't that your basic argument? Yes. Okay. Yeah. Let me just address some of the other arguments that Mr. Barkley made. So the HIPAA issue, he is correct that the HIPAA issue was not a stated basis for termination, but it could have been. And the fact that Censura felt it had adequate basis for termination without relying on that doesn't mean that that couldn't be a factor in affirming summary judgment. It could have, it was a problem. How could it be if the HIPAA issue was not a reason for terminating her? It was not a reason for retaliation. How could we possibly consider that? Well, there was deposition testimony that explained why it wasn't considered and basically they didn't want to pile on. There was no need to resolve a HIPAA compliance issue going forward. It was not a basis for termination. That's right, but it could have been. Well, you're saying they considered it, but they didn't list it. Is that what you're saying? I mean, it was discussed. Yeah, it's one of the factors that are unique to write that's mentioned near the end, I believe, of the document I was just reading from. Yeah, and I've got that document now in front of me. And that document references the HIPAA issue? It does. All right. I don't see it. Where? Tell me where. I'm on page 437 right now. You said it's towards the end. Yeah, it should be 439. So it's the very last three paragraphs. The, excuse me, third to last and second to last. Okay, I see it. So it was discussed, but it wasn't listed as a reason in her termination. That's right. There is a factor that distinguishes her from the male co-workers that they could have relied on, but chose not to because they did not want to pile on unnecessarily. Mr. Barkley also pointed out that Archuleta had certain problems with her and with the male staff also. And I would just mention that he did speak to them to address his concerns that they weren't being forthright about the training that he had reason to understand they had received about how lidocaine was supposed to be charged. So he did. It's not like he completely ignored that. But what he knew is not even the issue because it's not disputed that he was not among the decision-makers. And in fact, that he wasn't even consulted in the termination decision. So, and obviously these decisions are evaluated from the perspective of the decision-maker. And if they were in good faith. The decision-makers relied on the complaints from Archuleta as in this exhibit. So if Archuleta had a vendetta based on gender and made all these complaints to the decision-makers and the decision-makers acted on them. Are you saying that the company would be insulated? Even though that would be a cat's paw theory. I believe and that has not been argued by right at any at any stage in this litigation. But aside from that, there's just no evidence to support that theory what the decision-makers had was is it my is it my understanding that what you're saying is it Frank Archuleta had a discussion with with the males. They had problems with on the pricing and the product, but he did not have a discussion similar discussion with his right about the problems with her and that is that she's not being supportive. Is that what I understand is correct. I don't know that the absence of any discussion with right by Archuleta is a fact that's in the record. I'm not entirely clear about the the complete history of their communications during the short time short time that he was her manager. But what the record does reflect is it? It doesn't reflect anything about whether he had a discussions with Miss right about the problems he had with her nothing in the record, but there is in the record that he had discussions with the two males. Is that if that's correct and and potentially he opted because of his more serious concerns about right to raise those with HR rather than address them himself, but that's not in the record. And the bottom line is that the decision-makers had essentially this document and and that amply justified the decision to terminate. Yeah, you're out of being no evidence to you need to wind up because you're I understand it's over. Yeah, they're being no evidence to refute the legitimate non-discriminatory reasons. Centra asks that judge Martinez's order be affirmed. Thank you. We will take this matter under advisement. I think you were out of time. Mr. Berkeley. Let me double-check that. No, I'm sorry. You have a minute left a minute 14. He was actually over by a minute and four. Oh, I'm sorry. I'm sorry. No, we'll take this matter under advisement.